1   MARC N. BERNSTEIN (SBN 145837)
    mbernstein@blgrp.com
2   WILL B. FITTON (SBN 182818)
    wfitton@blgrp.com
3   THE BUSINESS LITIGATION GROUP, P.C.
    150 Spear Street, Suite 800
4   San Francisco, CA 94105
    Telephone: 415.765.6633
5   Facsimile: 415.283.4804

6   Attorneys for Plaintiff
    UAB "PLANNER5D"
7

8

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13
    UAB "PLANNER5D" dba PLANNER 5D,          **Case No.**
14
                      Plaintiff,
15
              v.
16

17
    FACEBOOK INC.,
18  FACEBOOK TECHNOLOGIES, LLC, THE          **COMPLAINT FOR**
19  TRUSTEES OF PRINCETON                    **COPYRIGHT INFRINGEMENT**
    UNIVERSITY, DOES 1-200, ABC
20  CORPORATIONS 1-20, and XYZ
    UNIVERSITIES 1-20.                       **DEMAND FOR JURY TRIAL**
21
22                    Defendants.

23

24

25

26

27

28

    Planner 5D's Complaint

UAB "Planner5D" (Planner 5D) sued Facebook, Inc., Facebook Technologies, LLC (together, Facebook), and The Trustees of Princeton University (Princeton or Princeton University) in a case entitled UAB "Planner5D" v. Facebook et al., Case No. 3:19-cv-03132 WHO (N.D. Cal. June 5, 2019) (the Companion Case). There, the Court dismissed Planner 5D's copyright claims but gave it leave to re-file them in a new lawsuit. (*See* Companion Case ECF Nos. 52 & 59.) Accordingly, for its new Complaint against Facebook and Princeton, Planner 5D now alleges as follows.

## INTRODUCTION

1.       Computer vision—the ability of machines to recognize three-dimensional scenes—is one of today's leading research fields. Whoever first masters this technology will forever change humankind's relationship with machines.

2.       Scene-recognition technology will soon enable robots to care for home-bound patients, and to boost safety and productivity at offices, airports, hospitals, and factories. It will also revolutionize an array of applications outside of robotics. One product looks after elderly people in their homes, using computer vision to detect changes in their gait or behavior, and to recognize stumbles or falls. Other applications will usher in a new era in virtual reality. Virtual objects will be seamlessly integrated into the user's actual indoor environment, enhancing realism for both industrial and recreational applications. Shipping giant DHL has already equipped its warehouse employees with "smart glasses" that use scene recognition to display where each item picked from the warehouse should be placed on the trolley for delivery. It's been estimated that the computer vision market will reach $48 billion by 2023, and $60 billion by 2025.

3.       Yet even as scientists make great strides in this burgeoning research area, they have encountered a roadblock. Teaching machines to recognize three-dimensional settings requires feeding them large volumes of realistic, digitized samples of such places—digitized doors, walls, furniture, and the like, arranged into plausible interiors that are readable by machines. Creating lifelike digital scenes is

**Planner 5D's Complaint**

1    extremely time- and labor-intensive, and requires the exercise of substantial human

2    judgment, creativity, and expression. For truly realistic scenes, human modelers

3    must personally craft each three-dimensional object, and human designers must

4    arrange the objects in lifelike configurations. Large collections of these kinds of three-

5    dimensional settings are thus exceedingly rare.

6          4.    Yet such collections are vital to scene-recognition research. In a slide

7    presentation posted online, a senior Princeton computer scientist asked, "What is the

8    main roadblock for 3D scene understanding and research?" His answer: "Data!!" (*See*

9    Thomas Funkhouser, *3D Data for Data-Driven Scene Understanding*, 8-9,

10   https://www.cs.princeton.edu/~funk/VRWorkshop.pdf (last visited March 30, 2020).)

11         5.    Planner 5D owns a collection of over a million hand-crafted, digitized,

12   and realistic three-dimensional objects and scenes, depicting a wide variety of

13   household and office designs. To Planner 5D's knowledge, no other collection in the

14   world numbers even in the tens of thousands. The company created and grew its

15   collection over many years, at a cost of millions of dollars. It began by creating

16   several thousand hand-crafted three-dimensional objects. These were lifelike models

17   of furniture, appliances, plants, people, lighting, or other objects that could occupy

18   the interior or immediate exterior of a structure. Millions of users of the company's

19   design tool then dragged and dropped these virtual objects into floor plans, creating

20   realistic three-dimensional interior designs, or "scenes." Each created design, or

21   scene, is stored on Planner 5D's own servers, for later access and use by Planner 5D

22   and the user who created it. Planner 5D's collection of such scenes has mushroomed

23   over the years to many millions of scenes. Users can designate their scenes for

24   inclusion in Planner 5D's public gallery. From these, Planner 5D carefully selects a

25   subset, numbering in the tens of thousands, to display in the public gallery. This

26   curated public gallery contains the scenes that are visible to all users. The remaining

27   scenes in Planner 5D's collection can be accessed or viewed only by Planner 5D or the

28   users who created them.

Planner 5D's Complaint

6.      Computer scientists at Princeton were eager to use Planner 5D's uniquely large, uniquely realistic collection of data. They decided to download the entirety of Planner 5D's then-existing public gallery of scenes, as well as all of Planner 5D's individual objects. Planner 5D will need discovery to determine the precise means by which Princeton did so. But on information and belief, they or others acting at their behest used special software tools, including Princeton's own software, specially engineered for this purpose, to access the digital files underlying Planner 5D's objects and scenes. Without these special tools, users could only see and manipulate on-screen images rendered from these data files. For example, users could see an image of a sofa, and drag and position it onto a floor plan for a living room. But the data files from which these images were rendered were always invisible, and wholly inaccessible, to users.

7.      On information and belief, using software developer tools, Princeton or its agents monitored and intercepted communications activity between Planner 5D's software and its European servers. Using information extracted from these intercepted communications, together with data-harvesting software of its own creation, Princeton determined the secret Internet addresses where the tens of thousands of Planner 5D's object and scene files were hidden. Princeton's computer code then crawled the location of each of the tens of thousands of addresses, scraping the files it encountered into its unauthorized collection.

8.      In this way, Princeton downloaded over five *gigabytes* of Planner 5D data. It then used this data for its scene-recognition activities. Princeton researchers published multiple articles using the data. The authors confessed the data's provenance: "We use a collection of 3D scene models downloaded from the Planner5D website." (*E.g.*, Yinda Zhang, *et al, Physically-Based Rendering for Indoor Scene Understanding Using Convolutional Neural Networks 3 (*Proceedings of IEEE Conference on Computer Vision and Pattern Recognition, 2017*)* https://arxiv.org/pdf/1612.07429v2.pdf.) (last visited March 30, 2020).)

Planner 5D's Complaint

9.      Princeton also made the stolen data available to researchers at a Princeton URL. Visitors to this URL would fill out a form and agree to certain terms in order to be approved for access to the dataset. Planner 5D will need discovery to determine exactly how many researchers applied to Princeton for access to the data, how many were accepted, who those researchers are, and whether and how their use of the data was restricted. Princeton labeled the stolen data the "SUNCG dataset."

10.      Defendants Facebook, Inc. and its subsidiary, Facebook Technologies, LLC (together, Facebook) were also interested in Planner 5D's objects and scenes. Facebook Technologies runs "Oculus," the well-known virtual-reality brand Facebook acquired in 2014. Scene recognition is a vital component of virtual-reality products and services. As one example, "scene fusion"—the fusing of virtual objects with the user's actual surroundings—relies critically on scene-recognition technology.

11.      Eager to tap the enormous commercial potential of scene recognition technology, Facebook assembled its own, internal, computer-vision team. This team then enlisted broader aid in its research.

12.      Facebook joined with researchers at Princeton, Stanford, UC Berkeley, Georgia Tech, and other institutions to jointly organize and run an international scene-recognition competition called the SUMO Challenge (**S**cene **U**nderstanding and **MO**deling Challenge). Facebook served as the lead sponsor of the SUMO Challenge. (*See* THE 2019 SCENE UNDERSTANDING AND MODELING CHALLENGE, https://sumochallenge.org/ (last visited March 30, 2020).) The first SUMO Challenge was launched in late August, 2018; another was held in 2019.

13.      SUMO Challenge entrants were encouraged to submit scene-recognition papers and algorithms. The SUMO Challenge organizers promised contest winners cash prizes and a speaking slot at a "SUMO Challenge conference." To facilitate contestants' work, beginning no earlier than the inaugural SUMO Challenge in mid-2018, Facebook and the other SUMO Challenge organizers created

Planner 5D's Complaint

their own copy of the SUNCG dataset, and made it available to contestants who signed up for the contest to use for their submissions. These SUMO Challenge organizers published a link to the copied SUNCG dataset, at a URL belonging to Stanford University—itself a SUMO Challenge organizer. In return for their chance at cash prizes and the opportunity to present their winning submissions, SUMO contestants granted Facebook a "perpetual, royalty-free, no-cost license and right to use and otherwise exploit" the submitted materials, including Facebook's right to use the contest submissions "in any merchandising, advertising, marketing, promotion or for any other commercial or non-commercial purpose." Planner 5D will need discovery to determine how many contestants applied to the SUMO Challenge for access to the SUNCG dataset, how many were accepted, who those contestants were, and how, if at all, their use of the data was restricted. But on information and belief, enough contestants were given access to the dataset to cause Planner 5D enormous economic damage.

14.     The gigabytes of data Princeton, Facebook, and an unknown number of others have downloaded and used are the intellectual property of Planner 5D. Planner 5D's data was scraped, copied, and used without its knowledge or permission. The defendants' copying, use, and public disclosure and dissemination of Planner 5D's core asset has caused catastrophic and potentially permanent damage to the company.

## JURISDICTION

15.     This case arises under the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.* Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

16.     The Court has personal jurisdiction over Facebook, Inc. and Facebook Technologies, LLC because each is headquartered in California.

17.     The Court has personal jurisdiction over Princeton University because, on information and belief, Princeton, together with its current and former employees and students has engaged in the following acts:

**Planner 5D's Complaint**

- participated in and assisted with the SUMO Challenge in California, including as SUMO Challenge organizers and advisors;

- worked with Facebook and other California-based companies, individuals, and institutions involved with the SUMO Challenge;

- received "generous support"—presumably cash funding—for scene recognition work from Silicon Valley companies such as Facebook, Inc., Google LLC, and Nvidia Corporation.

- permitted the copying and storage in this district of the SUNCG dataset used in the SUMO Challenge;

- made its own copy of the SUNCG dataset generally available for download in California, an invitation that on information and belief at least some California residents accepted;

- co-authored articles with California residents about the SUNCG dataset, and specifically its origin as data downloaded from Planner 5D;

- consented to and enabled the current sabbatical here, at Google and Stanford, of Dr. Thomas Funkhouser, one of Princeton's leading computer-vision professors. Dr. Funkhouser co-authored articles dealing with Princeton's use of the Planner 5D data and serves as one of four members of the SUMO Challenge Advisory Board; and

- accepted Facebook's support of another of its key scene-understanding researchers, Dr. Shuran Song, via a "Facebook Fellowship."

18.    The Court also has personal jurisdiction over all defendants because no defendant timely challenged personal jurisdiction in the Companion Case. The defendants thereby waived a jurisdictional challenge there, Fed. R. Civ. P. 12(h)(1), and, by extension, also here.

Planner 5D's Complaint

**VENUE**

19.     Venue is proper in this district under 28 U.S.C. § 1400(a), because the defendants and their agents either reside or can be found in this district.

20.     Venue is also proper in this district because no defendant timely challenged venue in the Companion Case. The defendants thereby waived a venue challenge there, Fed. R. Civ. P. 12(h)(1), and, by extension, also here.

**INTRADISTRICT ASSIGNMENT**

21.     This is an intellectual property action subject to assignment on a district-wide basis. N.D. Cal. Civ. Local Rule 3-2(c). The Companion Case has been assigned to the San Francisco Division.

**PARTIES**

22.     Planner 5D is a private limited liability company organized under the laws of the Republic of Lithuania.

23.     Facebook, Inc. is a Delaware corporation with headquarters in Menlo Park, California.

24.     Facebook Technologies, LLC is a Delaware limited liability company headquartered in California. It is a subsidiary of Facebook, Inc.

25.     The Trustees of Princeton University is a non-profit educational corporation and academic institution in New Jersey. In this complaint, "Princeton" refers to the university, its employees, agents, and others acting at its behest and direction.

26.     Does 1-200 are individuals whose names and identities Planner 5D does not presently know, but who, on information and belief, committed or facilitated the copyright infringement or other acts or omissions alleged here. Planner 5D will add the names and identities of these Doe defendants when it learns them.

27.     ABC Corporations 1-20 are business entities or unincorporated associations, whose names, states of organization or incorporation, and entity types Planner 5D does not presently know, but which, on information and belief,

Planner 5D's Complaint

1  committed or facilitated the copyright infringement or other acts or omissions

2  alleged here. Planner 5D will add the names and identities of these business entities

3  or unincorporated associations when it learns them.

4         28.     XYZ Universities 1-20 are academic institutions whose identities, or

5  whose exact role in the events alleged here, Planner 5D does not presently know. On

6  information and belief, some of these academic institutions committed or facilitated

7  the copyright infringement or other acts or omissions alleged here. Planner 5D will

8  add the names, identities, and roles of these academic institutions when it learns

9  them.

10        29.     On information and belief, in committing the acts or omissions alleged

11 in this complaint, each defendant conspired with, aided and abetted, or acted in

12 concert with each other, and each acted as the agent of each other. Under principles

13 of *respondeat superior* and like principles, employer defendants are liable for the acts

14 and omissions of their employees and agents.

## GENERAL ALLEGATIONS

15

16 **A.     Planner 5D and Its Object and Scene Files**

17        30.     Planner 5D was founded in 2011 as a user-friendly home design tool

18 that allowed anyone to quickly and easily create their own home, office, or landscape

19 designs. Users select from thousands of available objects, from structural features

20 (such as windows, arches, doors, and stairs), to furniture (such as sofas, beds, tables,

21 chairs, and rugs), to kitchen and bathroom appurtenances (such as baths and sinks),

22 to electrical appliances (such as lights, video equipment, and computers), to exterior

23 features (such as paths, lawns, trees, plants, barbeques, and swimming pools). To

24 create a design, users simply drag any of these objects onto or around a chosen floor

25 plan. Once added to a design, these objects can be quickly and easily moved, rotated,

26 tilted, re-sized, or otherwise manipulated to create the desired design. Users can

27 easily toggle between two- and three-dimensional presentations of the design. In 3D,

28 a design can easily be rotated and tilted to any desired perspective.

**Planner 5D's Complaint**

1       31.    In the years since its founding, Planner 5D has become a leader in web-

2   based interior design tools. It currently has over 40 million users worldwide.

3                   **1.      Planner 5D's Object Files**

4       32.    Planner 5D created its collection of realistic, digitized objects over a

5   span of many years at a cost of millions of dollars. Planner 5D continues to add to

6   this collection. At the time Princeton scraped Planner 5D's object data, it scraped the

7   entire then-existing collection, which numbered over 2,600 data files of objects.

8   Currently, Planner 5D owns a collection of over 4,500 individual object files.

9       33.    Planner 5D's objects are original and creative works of authorship in

10  each of three independent ways. First, original and creative design choices govern

11  the nature and appearance of the 3D objects, including how the objects are rendered

12  on users' screens. Second, the digital files that generate these 3D images are

13  themselves the product of creative choices, with multiple digital configurations

14  possible for a single design object. And finally, Planner 5D's selection of objects for

15  inclusion in its object collection is itself an original and creative process giving rise to

16  copyright protection.

17                  **a.      Originality and Creativity of the Rendered**
18                  **Images**

19      34.    Concerning the first level of creative expression, the 3D images as

20  rendered, Planner 5D's designers draw on their creative imagination in a number of

21  different ways. First, some of Planner 5D's objects are not modeled on any particular

22  reference image, but stem entirely from the designers' imaginations. Examples

23  include 3D models of people, animals, flowers, and plants. Second, even where

24  designers begin with a reference image, such as a drawing or a photograph, they

25  never mechanically copy the reference. They never copy its measurements, for

26  example, or use other mechanical or automated means of reproducing it. Their

27  judgment and creative expression govern the models' dimensions, sizes, shapes,

28  angles, proportions, relative placements, textures, and colors. These choices can be

9

**Planner 5D's Complaint**

compared to a photographer's choices about the lighting, angles, highlights, shadows, and other features of photographic composition.

35.     Many of these creative choices entail still further, subsidiary, choices. For example, modelers not only select two-dimensional textures to apply to the three-dimensional models, they also choose from a broad array of visual attributes those textures will possess. These choices govern not only the size of the texture and how it should be fitted to the surface—e.g. by stretching or tiling—but also how to mix and configure visualization attributes such as: UV mapping, specular intensity and color, transparency, translucency, blending, diffuseness color, and alpha channels.

36.     Each attribute directly affects the appearance of the finished 3D models. UV mapping specifies the stretches and other reshaping the two-dimensional texture will undergo to fit the desired three-dimensional surface. Specular intensity refers to the degree of pure reflectivity of the model's surface. Turning this knob up or down will cause the finished model to appear with more or less mirror-like reflections. A related knob controls the modelers' desired coloring of these reflections. Transparency and translucency are related but distinct further design choices. They govern whether and how much the textured surface appears to transmit light through itself, and if that transmission is clear or blurred. Blending values are a related choice governing how light reflecting from a surface appears to be mixed with the light transmitting through it. Diffuseness color refers to a base color of the surface. Alpha channels control transparency on a point-by-point basis. Each of these creative choices is made by Planner 5D and its modelers. Each contributes significantly to the appearance of the finished product.

37.     Modelers also use independent creative expression to create multiple distinct furniture pieces from a single reference image. For example, starting with a reference image of a chair, a designer might create not just his or her own version of

**Planner 5D's Complaint**

that chair, but also a sofa, bench, or love seat, all inspired by the same original reference. Each new furniture piece entails its own design choices.

38.     Moreover, Planner 5D authored and issued to its modelers guidelines for the models' appearance, adding another layer of creative input to the finished products' textures, lighting, materials, and colors

39.     Planner 5D's models are designed to look realistic. "Realistic" means *appearing* to exist in real-life. It does not mean *actually* existing in real life, in the sense of replicating an actual real-life object. Thus, as noted, many of Planner 5D's objects were created wholly from the modelers' artistic imaginations, with no reference object. These objects are "realistic" but have no real-world counterparts. Other Planner 5D objects *are* inspired by reference images. But these models' realism stems from appearing as though they *could* exist, not from looking exactly like something that does exist. "Realism" does not imply fidelity to a particular original. It simply implies seeming real.

### b.     Originality and Creativity of Underlying Digital Object Files.

40.     In addition to the expressive choices embodied in the design of Planner 5D's objects, there is a separate layer of creativity and originality in the digital files that store those 3D objects. First, every design choice described above is translated into and thus reflected in the strings of text that comprise the digital files. In creating their original 3D models, Planner 5D's modelers are simultaneously creating original digital files whose text strings encode those creative choices. The result is a digital file that is itself entitled to copyright protection. Second, the digital files underlying every 3D object can be represented many different ways. The structure and organization of the digital files for each 3D object depends on the creative choices modelers make in how they create that particular object. These choices, as recorded in the underlying digital file structure, represent a separate and independent level of expressive content that is entitled to copyright protection.

**Planner 5D's Complaint**

c.      **Originality and Creativity of Object Compilation**

41.      Finally, Planner 5D's choices of objects to include in its collection is separately protectable as a copyrightable compilation. Each of the thousands of objects in Planner 5D's collection was carefully selected for inclusion by Planner 5D. Planner 5D had its own vision of the kinds and varieties of objects it wanted. Its choices in assembling this collection, from among the virtually infinite number of possible ones, reflected both originality and creativity.

d.      **Secrecy and Protection of Underlying Digital Object Files**

42.      Each of Planner 5D's object files was located at a unique, and secret, Internet address on Planner 5D's servers. These addresses are never shown to Planner 5D's users. Rather, users see only pictures of home-design objects that can be selected for inclusion in a floor plan. When a user clicks on and drags a picture of a desired object, Planner 5D's proprietary software will, operating in the background and invisibly to the user, fetch the corresponding data file from a secret Internet address. Identifying the secret address of the object, or accessing the underlying data file stored there, is impossible without circumventing Planner 5D's software and penetrating non-public addresses on its servers. Circumvention of these protections requires, first, using software developer tools to monitor and intercept communications activity between Planner 5D's software and its European servers. Combining key information gleaned from these intercepted communications with specially-designed data-harvesting software, a hacker could determine the secret Internet address of each object file, and the full catalog of object files could be crawled and scraped.

43.      Without tools and techniques of this kind, users of Planner 5D's website could not and cannot access the location or the content of even one of Planner 5D's over-2,600 object files.

**Planner 5D's Complaint**

44.    Each of Planner 5D's over-2,600 object files is individually a trade secret belonging to Planner 5D. Separately, the *compilation* of over-2,600 object data files itself constitutes a trade secret belonging to Planner 5D.

### 2.    Planner 5D's Scene Files

45.    In addition to its collection of over 2,600 object files, Planner 5D also owns a much larger set of data files that contain floor plans, or "scenes." These scene files store configurations, or arrangements, of individual objects, that have been superimposed on a floor plan. Planner 5D's website includes a large public gallery of pre-existing scenes (floorplans) that have been carefully selected to showcase the program's capabilities, and to provide templates for users who don't want to start their floor plans from scratch. As with Planner 5D's object files, each scene file in this gallery was individually created by a human designer.

### a.    Originality and Creativity of Scene Compilation

46.    When Princeton scraped Planner 5D's files, the company's publicly-available gallery of scenes numbered over 45,000 scenes. Each of these scenes was hand chosen by Planner 5D personnel for inclusion in the public gallery from a vastly larger collection of scenes. Their selection was based on criteria that included artistic value, variety, novelty, and suitability for a family-friendly service (*i.e.*, absence of offensive or indecent content). Princeton scraped each and every one of these over-45,000 scene files then located in Planner 5D's public scene gallery. It thus copied the entire copyrighted compilation.

47.    Planner 5D's scene files, like its object files, are "realistic." This means they are floor plans that resemble actual, plausible, interior and exterior designs that someone might design. As with the object files, "realistic" in this context does not mean that the floor plans were copied from actual floor plans somewhere. To the contrary, they are floor plans assembled from the imaginations of individual designers and reflect their creative choices.

**Planner 5D's Complaint**

1
2

**b.**     **Secrecy and Protection of Underlying Digital Scene Files**

3      48.      As with the data files defining objects, those defining scenes are each

4   kept at a unique, and secret, Internet address on Planner 5D's servers. Neither these

5   datafiles nor their secret Internet addresses are ever shown to Planner 5D's users.

6   Rather, users see only pictures of pre-existing scenes, or floor plans, that they can

7   build on to personalize their interior design. When a user clicks on a desired picture

8   of a scene, Planner 5D's proprietary software will, operating in the background and

9   invisibly to the user, fetch the data file for that scene from the secret Internet address

10   at which it is stored. The software then renders the data file into a scene that is visible

11   on the user's screen. Identifying the secret address of the scene, or accessing the

12   underlying data file stored there, is impossible without circumventing Planner 5D's

13   software and penetrating non-public addresses on its servers. Circumvention of these

14   protections requires, first, using software developer tools to monitor and intercept

15   communications activity between Planner 5D's software and its European servers.

16   Combining key information gleaned from these intercepted communications with

17   specially-designed data-harvesting software, a hacker could determine the secret

18   Internet address of each scene file, and the full catalog of scene files could be crawled

19   and scraped.

20      49.      Without such tools and techniques, users of Planner 5D's website could

21   not and cannot access the location or the content of even one of Planner 5D's over-

22   45,000 scene files.

23      50.      The data file underlying each individual scene, like those underlying

24   each object, is a trade secret belonging to Planner 5D. Separately, the *compilation* of

25   over 45,000 scene data files is a trade secret belonging to Planner 5D. The company

26   spent years and significant sums of money creating and compiling these trade

27   secrets.

28

**Planner 5D's Complaint**

**B.      Planner 5D's Terms of Service**

51.      When Princeton crawled and scraped Planner 5D's data files, its Terms of Service strictly limited users' use of the website and its materials, including a blanket prohibition on "access[ing]" or "acquir[ing]" Planner 5D's files. No user was permitted to

> collect, use, copy or distribute any portion of the Planner5D project or the Materials [defined as any materials found or created on the Planner 5D site]; resell, publicly perform or publicly display any portion of the Materials; modify or otherwise make any derivative uses of any portion of the Planner5D project, the Mobile applications or the Materials; use any "deep-link," "page-scrape," "robot," "spider" or other automatic device, program, algorithm or methodology which perform similar functions to access, acquire, copy, or monitor any portion of the Planner5D project; . . . download (other than page caching) any portion of the Planner5D project, the Materials or any information contained therein or use [of] the Planner5D project or the Materials other than for their intended purposes.

52.      Because these Terms of Service prohibit even "access[ing]" or "acquir[ing]" the underlying data files, they protected the secrecy of Planner 5D's data files more completely than would a simple non-disclosure agreement. Non-disclosure agreements bind parties who have been shown confidential information not to disclose it to others. Planner 5D's Terms of Service go further. They prohibit users even from *seeing* (via "access[ing]" or "acquir[ing]") the information in the first place. Users cannot disclose information they have never seen. Because users always see objects and scenes only as *rendered*, never as data files, Planner 5D's Terms of Service, which prohibit accessing and seeing the underlying files in the first place, protect those files more securely than if the files could be seen by users who then merely promised never to reveal them.

53.      Because the Terms of Service prohibited visitors like Princeton from even *accessing* Planner 5D's underlying data files, and also prohibited them from acquiring or sharing the files in any manner (such as by "download[ing]," "distribut[ing]," or "resell[ing]" the files), the Terms of Service created a duty of

Planner 5D's Complaint

1   confidentiality for Princeton to maintain these files' secrecy. Princeton breached that

2   duty, as detailed elsewhere in this complaint.

3       54.     Planner 5D is the successor-in-interest to the rights bestowed on

4   "Farminers Limited" in the Terms of Service. Farminers Limited was an early

5   investor in the business, but subsequently assigned all of its intellectual property

6   rights, including all rights under the Terms of Service, to Planner 5D. Even before

7   this assignment, Planner 5D was an express intended beneficiary of the Terms of

8   Service.

9       C.     **Combined Effect of Structural and Legal Barriers**

10       55.     Acting together, the Planner 5D Terms of Service and the website

11   architecture described above, where users are walled off from both the location and

12   the content of Planner 5D's data files, create a rigorous barrier blocking access to, or

13   even awareness of, the content of the underlying data files. Users see only renderings

14   of objects that they can drag and drop into renderings of floor plans, *i.e.* scenes. Once

15   users drop rendered objects into rendered scenes, the users can resize, reposition, or

16   reorient the rendered objects. What they may never do is see or access, much less

17   download or copy, the underlying data files from which those renderings are made.

18       56.     Planner 5D's complete concealment of both the location and the content

19   of its underlying data files distinguishes this case from ones in which website

20   operators gave users "unfettered access" to each and every trade secret they later

21   complained had been misappropriated. *Cf. Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d

22   495, 521-22 (S.D.N.Y. 2017) (users given "unfettered access" to all trade secrets at

23   issue). As described in detail above, Planner 5D consistently walls off both the

24   location and the content of the trade secrets at issue here, and, under its Terms of

25   Service, separately prohibits circumventing these protections via crawling, scraping,

26   or otherwise accessing its data files.

27

28

**Planner 5D's Complaint**

**D.      Planner 5D's Business Evolves into AI and Scene Recognition.**

57.     As the importance and promise of scene-recognition technology grew in the years since Planner 5D's founding, the company's core business objective likewise evolved from providing home design tools to becoming a leader and innovator in computer scene recognition.

58.     The market for AI-enhanced software is expected to grow to $60 billion by 2025. One of Planner 5D's key goals has become leveraging its unparalleled repository of three-dimensional object and scene files to develop first-of-its-kind scene-recognition technology. To that end, over the past several years Planner 5D has invested significantly in developing algorithms that capitalize on Planner 5D's catalog of three-dimensional files to achieve market-leading 3D recognition.

**E.      Defendants' Identification, Scraping, Copying, Display, Distribution, and Use of Planner 5D's Files**

**1.      Princeton's Acquisition, Copying, Display, Distribution, and Use of Planner 5D's Object and Scene Files**

59.     On information and belief, sometime in or before 2016, scene-recognition scientists at Princeton determined that large sets of realistic, digitized, three-dimensional scene and object data were critical to their research. In a December 30, 2016 academic paper on scene understanding, they wrote that "[i]ndoor scene understanding is central to applications such as robot navigation and human companion assistance." (Yinda Zhang *et al.*, *Physically-Based Rendering for Indoor Scene Understanding Using Convolutional Neural Networks*, 1 (Proceedings of IEEE Conference on Computer Vision and Pattern Recognition, 2017), https://arxiv.org/pdf/1612.07429v2.pdf (last visited March 30, 2020).) The Princeton scientists noted that "[o]ver the last years, data-driven deep neural networks have outperformed many traditional approaches thanks to their representation learning capabilities." (*Id.*)

60.     Yet such successful data-driven methods had a built-in limitation: finding enough data. The Princeton researchers wrote: "One of the bottlenecks in

Planner 5D's Complaint

1   training for better representations is the amount of available per-pixel ground truth

2   data that is required for core scene understanding tasks." (*Id.*) As one of these

3   authors separately wrote in a slide presentation he posted to a Princeton URL: "What

4   is the main roadblock for 3D scene understanding and research?" "Data!!"

5   (Funkhouser, *supra*, at 8-9.)

6        61.    "To address this problem," the Princeton scientists observed in their

7   December 2016 article, other researchers had proposed using synthetic data. Yet no

8   one had explained where such synthetic data could be found. In their article, the

9   Princeton authors solved this problem. Their solution: download all required data

10   from Planner 5D. As the authors put it: "In this work, we introduce a large-scale

11   synthetic dataset with 400K physically-based rendered images from 45K realistic 3D

12   indoor scenes." The data came from a "a collection of 3D scene models downloaded

13   from the Planner 5D website." (Zhang *et al.*, *supra*, at 1, 3.)

14        62.    The Princeton authors explained that the downloaded Planner 5D

15   dataset contained "45622 scenes with over 5M instances of 2644 unique objects

16   among 84 objects categories." (*Id.* at 3.) Special surfaces provided by Planner 5D gave

17   the objects a desirable "photo-realistic" appearance. (*Id.*) Another key feature of the

18   Planner 5D dataset was that "indoor layouts, furniture/object alignment, and surface

19   materials are designed by **people**." (*Id.* (emphasis added)). Human-designed models

20   and scenes were likely to be realistic. And realism was vital for accurate machine

21   learning. (*Id.*)

22        63.    Princeton called its collection of Planner 5D data the "SUNCG dataset."

23   It offered this link for registering to download the dataset:

24   http://suncg.cs.princeton.edu/ (now returning an error message). In the ensuing

25   years, Planner 5D's data figured prominently in the Princeton's researchers' work,

26   including in further articles they published on scene recognition. (*E.g.*, Shuran Song

27   *et al.*, *Im2Pano3D: Extrapolating 360° Structure and Semantics Beyond the Field of View*, 8

28   (Proceedings of IEEE Conference on Computer Vision and Pattern Recognition,

**Planner 5D's Complaint**

2018*)*, https://arxiv.org/pdf/1712.04569.pdf) (last visited March 30, 2020).) One co-author on these articles, Manolis Savva, is now a senior Facebook computer-vision researcher.

64.    Planner 5D's data also became featured in the work of researchers at other institutions, including at Facebook. (*E.g.*, Abhishek Das *et al*, *Embodied Question Answering*, 4 (Computer Vision and Pattern Recognition Expo, 2018), https://embodiedqa.org/paper.pdf) ("We instantiate EmbodiedQA in House3D [1], a recently introduced rich, simulated environment based on 3D indoor scenes from the SUNCG dataset [8]. Concretely, SUNCG consists of synthetic 3D scenes with realistic room and furniture layouts, manually designed and crowdsourced using an online interior design interface (Planner5D [38]).").)

65.    Another project relying on the SUNCG dataset was "PlanIT." A principal author of this project was Manolis Savva, the senior Facebook computer-vision researcher who co-authored the articles, discussed above, that described Princeton's downloading and use of Planner 5D's data.

66.    Princeton's researchers have thus exploited, and continue to exploit, Planner 5D's core asset, and are doing so for the same purpose Planner 5D has set for itself: developing artificial intelligence applications featuring 3D scene recognition.

67.    Planner 5D will need discovery to determine the precise means by which Princeton scraped Planner 5D's data files. But on information and belief, the Princeton researchers or others acting on their behalf executed a detailed, multi-step plan to pierce Planner 5D's software protections and acquire its data. First, using software developer tools, Princeton or its agents monitored and intercepted communications activity between Planner 5D's software and its European servers. Through this monitoring and interception, Princeton extracted key information pointing it to the secret locations of all data files on Planner 5D's servers. Princeton then wrote its own data-harvesting software that drew on the stolen Internet address

Planner 5D's Complaint

1   information to allow it to crawl and scrape the entirety of Planner 5D's then-existing

2   data files.

3       68.    The data scraping techniques Princeton used to acquire Planner 5D's

4   data files violated clear prohibitions in the Terms of Service against using any "'page-

5   scrape,' 'robot,' 'spider[,]' or other automatic device . . . to access, acquire, copy, or

6   monitor any portion of the Planner5D project."

7       69.    These Terms protected the secrecy of Planner 5D's data files one level

8   more securely than a standard non-disclosure agreement. Standard NDAs prohibit

9   users from disclosing secret information that is shared with them. Planner 5D's

10  Terms prohibit the secret information even from being shared with them. There is

11  thus nothing for users to promise not to disclose. Those never shown a secret recipe

12  cannot sensibly promise not to reveal it.

13      70.    Because Planner 5D's website hid the locations and contents of its data

14  files, and because Princeton had to design and deploy hacking software to obtain this

15  information, Princeton knew or should have known that Planner 5D intended for the

16  data files to remain confidential.

17      71.    Separately, Princeton's clear violation of the Terms of Service's

18  prohibitions on scraping, crawling, and downloading Planner 5D's data, and its

19  prohibitions on use of the data other than for its intended purpose of interior design,

20  constituted improper means of acquiring the data.

21      72.    Planner 5D had no indication of any of this until 2018, nor could it

22  have. It did not canvass international academic literature on scene recognition.

23  Instead, having protected its digital files as described above, it attended to the day-

24  to-day operations of its web-based design service. It also conducted its own, private,

25  AI scene-recognition research. It was until 2018, when a third-party mentioned

26  having seen Planner 5D data at a Princeton URL, that Planner 5D had an indication,

27  though even then an incomplete one, of the facts described above. Most recently, in

28  2019, Planner 5D determined that over 99.9% of the data files in the SUNCG dataset

Planner 5D's Complaint

are identical to the object and public-gallery scene files Planner 5D possessed when Princeton did its scraping. On information and belief, the remaining .1% of the files are also downloaded Planner 5D data files, but ones that have been slightly altered. Some of the SUNCG data files even continue to bear Planner 5D's registered trademark, <PLANNER 5D>.

### 2. Facebook's Involvement with Princeton and the SUNCG Dataset, Including the SUMO Challenge

73.     Facebook, Inc. and Facebook Technologies, LLC have also been acutely interested in scene-recognition technology. They have created and funded their own, in-house team of scientists and engineers to research and develop scene and object recognition and understanding. This research team operates, on information and belief, within Facebook's "Facebook Reality Labs," a major AR/VR (augmented reality / virtual reality) research center with offices across the United States.

74.     In 2018, Facebook Reality Labs joined with researchers at Princeton, Stanford, UC Berkeley, Georgia Tech, and other institutions to jointly organize the first Scene Understanding and Modeling (SUMO) Challenge. The primary sponsor of the SUMO Challenge was Facebook. The SUMO Challenge "targets development of comprehensive 3D scene understanding and modeling algorithms." (*See* Facebook Research, *Facebook Reality Labs Launches the Scene Understanding and Modeling (SUMO) Challenge*, FACEBOOK RESEARCH (MARCH 30, 2020, 6:40 PM), https://research.fb.com/facebook-reality-lab-launches-the-scene-understanding-and-modeling-sumo-challenge/.)

75.     The SUMO Challenge was developed by a team of computer vision researchers at Facebook, with help from researchers at Stanford, Princeton, and elsewhere. (*Id.*) Current and former Stanford and Princeton researchers have also served as SUMO Challenge organizers, advisors, or program committee members.

76.     SUMO Challenge contestants are "evaluated on their ability to consistently infer the correct geometry, pose, appearance and semantics of the

21

1  elements" of scenes supplied by the SUMO Challenge organizers. (*Id.*) Winners were

2  promised cash prizes and speaking spots at the SUMO Challenge conference.

3       77.    Facebook directed SUMO Challenge participants to the SUNGC dataset

4  to develop and hone their contest submissions. On information and belief, Facebook

5  and the other SUMO Challenge organizers, including Stanford and Princeton, made

6  a fresh copy of the Princeton SUNCG dataset sometime in or after 2018, and stored it

7  at a Stanford URL. Facebook posted a link to this Stanford URL on its SUMO

8  Challenge web page, encouraging contestants to access, download, and use the

9  dataset for their work. On information and belief, dozens of copies or more of this

10  copy of the SUNCG dataset have been downloaded and used, by an unknown

11  number of users.

12       78.    In 2019, the Facebook defendants and other SUMO Challenge

13  organizers launched another SUMO Challenge, the 2019 SUMO Challenge.

14       79.    Starting in or after 2019, Facebook has also made other copies and other

15  uses of the SUNCG dataset. It linked to one such copy in another of its object-

16  recognition projects, the "House 3D environment." According to Facebook, House

17  3D "is a rich environment containing thousands of human-designed 3D scenes of

18  visually realistic houses with fully labeled 3D objects, textures, and scene layouts."

19  Once again, these thousands of scenes came from Planner 5D. Facebook got them by

20  "extract[ing them] from the SUNCG dataset." (*See House3D*, FACEBOOK ARTIFICIAL

21  INTELLIGENCE (March 30, 2020, 6:42 PM), https://ai.facebook.com/tools/house3d.)

22       80.    Facebook also sponsors a scene-recognition project called AI Habitat, a

23  new simulation platform that is designed to train machines to recognize interior

24  scenes using photo-realistic, simulated three-dimensional environments. Facebook's

25  AI Habitat project relies on the SUNCG dataset as a source of realistic three-

26  dimensional environments.

27       81.    Facebook maintains many close connections to Princeton and its

28  researchers. On information and belief, Facebook has supported Princeton and its

**Planner 5D's Complaint**

1   researchers financially. For example, Princeton's "Vision & Robotics" Department

2   has publicly thanked Facebook (among others) for its "generous support" "for our

3   research." Dr. Shuran Song, a Princeton Ph.D student and co-author of several of the

4   articles describing Princeton's downloading of Planner 5D's data, has been a

5   recipient of "a Facebook Fellowship," according to an article she and five other

6   Princeton scientists authored. (Shuran Song *et al.*, *Semantic Scene Completion from a*

7   *Single Depth Image* 9 (Proceedings of IEEE Conference on Computer Vision and

8   Pattern Recognition 2017), https://arxiv.org/pdf/1611.08974v1.pdf (last visited March

9   30, 2020).)

10  82.     Another scene-recognition researcher, Manolis Savva, who co-authored

11  multiple articles with Princeton's Shuran Song discussing Princeton's harvesting of

12  Planner 5D's data for use in the SUNCG dataset, is a visiting researcher at Facebook

13  and a lead researcher at Facebook's AI Habitat computer-vision project. One of

14  Facebook's leading scene-recognition researchers was thus a co-author of the very

15  articles detailing Princeton's acquisition and harvesting of Planner 5D's data for use

16  in the SUNCG dataset.

17  83.     Further, and as noted above, the SUNCG dataset Facebook has been

18  using so intensively includes files that still bear Planner 5D's registered trademark:

19  <PLANNER 5D>.

20  84.     Facebook's close association with so many of the Princeton scientists

21  who scraped and downloaded Planner 5D's data without permission, including

22  Shuran Song and Manolis Savva; its "generous support" of Princeton's Vision &

23  Robotics Department; its copying and extensive use of a dataset that still includes

24  Planner 5D's registered trademark; and its co-sponsorship with Princeton of the

25  SUMO Challenge, all strongly suggest that Facebook had actual knowledge, and at

26  the very least reason to know, that the SUNCG dataset contained proprietary

27  information belonging to Planner 5D, and that Princeton—which could not have

28  shown Facebook any authorization for its use of that information, since it lacked

Planner 5D's Complaint

1   any—had acquired the SUNCG dataset by improper means, and under

2   circumstances giving rise to a duty to maintain the secrecy, and limit the use, of that

3   data.

4       85.     Indeed, on information and belief, researchers then affiliated with

5   Facebook knew of, supported, participated in, and benefited from all of Princeton's

6   research alleged above, including the scraping and exploitation of Planner 5D's data.

7       86.     In addition, on information and belief, as an agent, partner, or joint

8   venturer of Princeton in the SUMO Challenge, Facebook also had imputed

9   knowledge that Princeton misappropriated the SUNCG dataset from Planner 5D.

10      87.     Finally, on information and belief, Facebook knew that Princeton

11  acquired the SUNCG dataset from Planner 5D without Planner 5D's permission and

12  in violation of the Terms of Service.

13      **F.     Defendants' Knowledge of the Terms of Service**

14      88.     On information and belief, Princeton and Facebook each in fact saw

15  Planner 5D's Terms of Service, and thus are each bound by them.

16      89.     Princeton also had constructive or inquiry knowledge of Planner 5D's

17  Terms of Service, and thus is bound by them, because of its sophistication, because of

18  its repeated interaction with Planner 5D's software and website, because data

19  scraping without permission is, by its nature, likely to infringe copyrights and other

20  intellectual property rights, and because Princeton's data-scraping required it to

21  consciously pierce the barriers Planner 5D had erected to block public access to the

22  data files, all of which should have indicated to Princeton that data-scraping was

23  likely not authorized by Planner 5D under its Terms of Service.

24      90.     Facebook also had constructive or inquiry knowledge of Planner 5D's

25  Terms of Service. It was funding Princeton's computer vision department,

26  sponsoring its researchers, working closely with Princeton on the SUMO Challenge,

27  and employing as a lead scene-recognition researcher one of the authors who

28  violated those Terms by scraping and downloading Planner 5D's data. Facebook also

**Planner 5D's Complaint**

1   has its own acute interest in commercially exploiting the SUNCG dataset, and knew

2   or should have known to investigate the provenance of this valuable data, especially

3   where data elements still bore Planner 5D's registered trademark.

4         91.    In addition, and on information and belief, before sharing the SUNCG

5   dataset with Facebook and the other SUMO challenge organizers, Princeton would

6   have informed Facebook and the others that it acquired the SUNCG dataset from

7   Planner 5D without its permission.

8         **G.    Defendants' Continuing Wrongdoing**

9         92.    Like Princeton, Facebook is exploiting the Planner 5D dataset for the

10  same purpose Planner 5D set for itself: to train artificial intelligence applications to

11  recognize 3D interior scenes. Worse, Facebook explicitly secured from SUMO

12  Challenge participants the right to commercialize the fruits of their work. This strikes

13  at the heart of Planner 5D's business objective.

14        93.    In March 2019, Planner 5D wrote Facebook, Princeton, and others,

15  demanding that they cease and desist infringement of Planner 5D's copyrights. Yet

16  Princeton and Facebook, on information and belief, nonetheless continue to use the

17  SUNCG dataset in their computer vision R & D efforts, and to allow or encourage

18  others' use of infringing and misappropriated copies of Planner 5D's copyrighted

19  and trade secret materials.

20        94.    The defendants' copying, misappropriation, and especially public

21  disclosure and dissemination of Planner 5D's data files threatens to destroy the

22  market for Planner 5D's core asset. It has inflicted catastrophic and potentially

23  permanent damage on the company.

**CAUSE OF ACTION**
**(Copyright Infringement — Against All Defendants)**

26        95.    Planner 5D incorporates the prior paragraphs of this complaint as

27  though fully set forth here.

**Planner 5D's Complaint**

96.     Planner 5D is the sole owner of all right, title, and interest in the copyrights in its collection of object files. The copyrights in this work were registered with the United States Copyright Office. The Copyright Office issued a Certificate of Registration for this work, entitled "Planner 5D objects" and bearing Registration Number TX 8-818-101, effective December 19, 2019. The certificate is attached to this complaint in Exhibit A.

97.     Planner 5D is the sole owner of all right, title, and interest in the copyrights in its compilation of scene files. The copyrights in this work were registered with the United States Copyright Office. The Copyright Office issued a Certificate of Registration for this work, entitled "Planner 5D scenes" and bearing Registration Number TX 8-818-102, effective December 19, 2019. The certificate is attached to this complaint in Exhibit A.

98.     By, among other things, duplicating, distributing, publicly displaying, and/or creating derivative works of Planner 5D's copyrighted objects and scenes (together, the Copyrighted Works), the defendants, and each of them, directly infringed Planner 5D's copyrights, in violation of the copyright laws of the United States, including 17 U.S.C. section 101 *et seq.*

99.     The copyrightable elements of Planner 5D's objects and scenes that the defendants copied, distributed, publicly displayed, and created derivative works of are precisely those identified in Paragraphs 33–41 and 45-47 above, describing Planner 5D's creative and original choices in fashioning its 3D objects, their underlying digital object files, and the compilations of both objects and scenes. Because the defendants made 99.9% identical copies of Planner 5D's Copyrighted Works for its SUNCG dataset, by copying and performing the other infringing acts on those Copyrighted Works, the defendants necessarily copied each and every one of Planner 5D's original and creative choices as described in Paragraphs 33–41 and 45-47 above.

Planner 5D's Complaint

1         100.    The defendants have also contributorily and/or vicariously infringed

2 Planner 5D's copyrights in the Copyrighted Works.

3         101.    For example, by encouraging researchers and SUMO contestants to

4 make their own copies of, distribute, or publicly display Copyrighted Works they

5 knew to be infringing, the defendants committed contributory infringement.

6         102.    In addition or in the alternative, the defendants vicariously infringed

7 Planner 5D's copyrights. They had the right and the ability to supervise and control

8 which models and scenes visitors to their websites were allowed to download, copy,

9 distribute, or publicly display. They selected the SUNCG dataset, a 2.5 terabyte

10 collection of Planner 5D's copyright works. And, on information and belief, Facebook

11 and Princeton financially benefitted from these activities. Facebook obtained

12 unlimited rights to commercialize, market, and use the submissions of the SUMO

13 Challenge contestants. Princeton's Computer Vision Group received "generous

14 support"—presumably financial—from Facebook and other high-tech companies

15 who benefitted from Princeton's sharing of its SUNCG dataset and its work with that

16 data. Princeton stood to attract still further sponsorship through its continuing

17 provision of resources, including the SUNCG dataset, to technology companies.

18         103.    On information and belief, the defendants' acts of direct, vicarious, and

19 contributory infringement were intentional, willful, and malicious, and performed

20 with knowledge that the works they or others were copying, selling, publicly

21 displaying, or creating derivative works of were copyrighted works whose copyright

22 they did not own and for which they lacked authorization to act as they acted, all in

23 reckless disregard of Planner 5D's rights.

24         104.    The natural, probable, proximate, and foreseeable result of the

25 defendants' copyright infringement was to cause immense damage to Planner 5D,

26 and to secure profits for themselves.  And the defendants' copyright infringement in

27 fact did cause Planner 5D immense damage.

28

**Planner 5D's Complaint**

1    105.    Planner 5D is entitled to disgorge the defendants' profits, and to
2  recover its actual damages, all in an amount to be determined at trial. Planner 5D is
3  also entitled to a permanent injunction prohibiting continuing or future infringement
4  of its rights, and ordering destruction of all infringing copies.

### PRAYER FOR RELIEF

6    Planner 5D prays for judgment on each cause of action against the defendants,
7  and each of them, and for the following further relief:

8    a.   for copyright damages, including Planner 5D's actual damages and
9         for any (non-duplicative) profits of the defendants;
10   b.   for pre- and post-judgment interest on all awards for which they are
11        available;
12   c.   for permanent injunctive relief prohibiting all defendants, their
13        officers, agents, successors, and assigns, and all persons acting in
14        concert with them, from further acts of direct or indirect copyright
15        infringement;
16   d.   for an order requiring the destruction of all infringing copies; and
17   e.   for such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

20   Planner 5D demands a jury trial on all issues qualifying for one.

22  RESPECTFULLY SUBMITTED,

23  DATED: March 31, 2020                THE BUSINESS LITIGATION GROUP, P.C.

25                          By:      /s/Marc N. Bernstein
26                                   Marc N. Bernstein

27                          Attorneys for Plaintiff
28                          UAB "PLANNER5D"

28